## COLLAMER v. COMMISSIONER OF INTERNAL REVENUE.
### No. 6144.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 12, 1950.

Decided Nov. 8, 1950.

William L. Parker, Norfolk, Va., for petitioner.

Sumner M. Redstone, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen. and Ellis N. Slack, Sp. Asst. to Atty. Gen., on brief), for respondent.

Before PARKER, Chief Judge, and DOBIE, Circuit Judge, and TIMMERMAN, District Judge.

DOBIE, Circuit Judge.

This is an appeal by E. L. Collamer, Sr., (hereinafter called taxpayer) from a decision of the Tax Court of the United States upholding the refusal of the Commissioner of Internal Revenue to recognize the existence of a partnership relation between taxpayer and his wife, in the operation of a moving picture theatre. Accordingly, the total income from the theatre for the calendar years 1943 and 1944 was held to be taxable to the taxpayer, against whom federal income taxes amounting to $19,812.40 for these two years was duly assessed.

The instant appeal presents to us the familiar and oft-litigated question of the validity of a so-called family partnership, here between husband and wife, for federal revenue purposes. The findings of the Tax Court may be disturbed by us if, but only if, these findings are clearly erroneous. Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L. Ed. 1659; Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670; Morrison v. Commissioner, 2 Cir., 177 F.2d 351, 354; Kohl v. Commissioner, 8 Cir., 170 F.2d 531, certiorari denied 337 U.S. 956, 69 S.Ct. 1528, 93 L.Ed. 1756; Hash v. Commissioner, 4 Cir., 152 F. 2d 722, certiorari denied 328 U.S. 838, 66 S. Ct. 1013, 90 L.Ed. 1614. Since we are unable to find that the decision of the Tax Court is clearly erroneous, that decision must be affirmed.

We summarize briefly the more important facts in this case, about which there appears to be little or no dispute.

On October 4, 1933, taxpayer entered into a written contract for the purchase of the "Park Theatre property" in Norfolk, Virginia, for $13,000, of which amount $1,500 was paid in cash. Taxpayer assumed payment of a mortgage on the property and a second mortgage was executed for the balance of $2,800.

On October 4, 1933, neither taxpayer nor his wife had money or property of any consequence. Title to the theatre property was taken in the name of taxpayer. The cash payment of $1,500 was obtained by taxpayer as a loan from his aunt, which loan was not evidenced at that time by a note or any other writing. Taxpayer borrowed an additional amount of $2,500 from his aunt, and on June 20, 1934, he and his wife executed a note payable to the order of his aunt in the amount of $4,000 secured by a deed of trust. The additional $2,500 was turned over by taxpayer to the former owner of the Park Theatre property to apply on the purchase price thereof.

The taxpayer made periodic payments on the mortgages on the Park Theatre property out of profits realized from the operation of the theatre. On December 23, 1936, the taxpayer and his wife executed and delivered to the Merchants and Mechanics Savings Bank of the City of Norfolk, Virginia, a note for $14,000, secured by a first mortgage on the theatre property and payable at the rate of $200 per month, the first payment to be made on February 1, 1937. The proceeds of this loan were used for the payment of all the then existing loans and mortgages against the Park Theatre property and for certain improvements and alterations to the theatre building. All payments on this loan were made out of the profits realized from the operation of the theatre. The note was paid in full on July 1, 1942.

On May 30, 1937, the taxpayer and his wife executed a note for $4,200 payable to the order of Merchants and Mechanics Savings Bank of the City of Norfolk. The proceeds of the note were used to purchase an air conditioning unit for the Park Theatre. This loan was paid from the proceeds of a note dated June 28, 1937, in the amount of $5,600 payable to the same bank and executed by taxpayer and his wife. The additional amount of $1,400 was used for the payment of the cost of installing the air-conditioning unit.

Until forced by ill health to quit in 1942, the taxpayer devoted his entire time to the management and operation of the theatre. He was assisted in the operation of the theatre by his wife, and his son and daughter, aged 15 years and 18 years in 1933, respectively. In addition the taxpayer employed two ushers, a projection-machine operator and a cleaner or janitor.

When taxpayer bought the theatre property, his wife told him that she "would go in and help him to try to make a go of it." She usually arrived at the theatre shortly before 3 o'clock in the afternoon and served as cashier in the box-office which opened at 3 P. M. and closed at 9:15 P. M. The daughter served as relief cashier from time to time during the day and also served as cashier for two or three weeks at a time in the absence of her mother. After the box-office closed, taxpayer's wife when acting as cashier took the receipts to the theatre office and checked them. She usually re-

mained in the theatre until the taxpayer was ready to leave after the closing of the theatre and they returned home together. At times when taxpayer was in the upstairs theatre office his wife sat in the theatre looking at the pictures. If any disturbance occurred she went up to the office to tell taxpayer about it. Taxpayer's wife called his attention to the need of cleaning and changing drapes and carpeting and to the dullness of the screen. She assisted taxpayer in the selection of new drapes and carpeting. At times, her choice of pattern prevailed. If she thought the janitor had not properly cleaned the theatre she told taxpayer so he could talk to the janitor about it. She never bought or booked any pictures. At times, when in the office, she listened to the picture salesman talking to her husband and son, but as a rule she left the office when such business matters were discussed. She signed the various notes hereinbefore referred to because she was requested to do so.

Taxpayer's wife received no compensation for her services. So much money as was needed for living expenses was taken from the daily receipts by taxpayer or his wife. The balance of the daily receipts was deposited in a bank. The books of account of the business carried no capital account or drawing account in the name of taxpayer's wife.

On Thanksgiving Day in 1942, taxpayer became seriously ill. The operation of the business was turned over to the son, who thereafter served as manager and was paid a salary of about $70 or $75 a week. Neither taxpayer nor his wife thereafter ever actively participated in the operation of the Park Theatre. Taxpayer's wife devoted all her time to her ill husband. The daughter served as cashier until she married in 1945. Thereafter, various persons, not related to taxpayer, were employed as cashiers. After the son assumed operation of the business, the net receipts were deposited in a joint account in the name of taxpayer and his wife. Some real property, other than the residence and theatre properties, was acquired at some undisclosed time, title to which was taken in the name of taxpayer's wife.

In January, 1943, taxpayer had sufficiently recovered to travel to California with his wife, where they visited the sister and brother-in-law of taxpayer's wife. At some time during the visit, the brother-in-law suggested to taxpayer, that, since both taxpayer and his wife had worked in the operation of the theatre business, they "should be in partnership" and the "returns should be made in partnership." Taxpayer wrote to his son about the suggestion and it was decided that when taxpayer returned to Norfolk they would have a certain registered public accountant prepare the income tax returns.

After taxpayer's return to Norfolk, the taxpayer and his son first consulted with the accountant. Upon the accountant's advice, a paper styled "Articles of Partnership" was signed by taxpayer and his wife, reading as follows:

"This agreement, Made this first day of January, 1944, between E. L. Callamer (sic) and Ada Callamer (sic), of the City of Norfolk, State of Virginia, Witnesseth:

"The said Parties have agreed, and by these presents do agree, to associate themselves as Partners in the business of operating what is known as moving picture theatre, or other amusements that would be of benefit to the Partnership. Said Partnership shall continue from the date of this agreement until mutually agreed to dissolve.

"And it is further agreed, between the said Partners, that the name of the Partnership hereby formed unless otherwise changed by agreement shall be the Park Theatre.

"All profits, gains and increase which shall be made in the conduct of the said business shall be equally and proportionately divided between them, share and share alike. And all losses that shall arise from the conduct of the business shall be borne equally between the said Partners.

"In Witness Whereof, we have hereunto set our hands, the day and year first above written."

It is only fair to state that until the year 1943, the profits from the theatre had not been sufficiently large to pose a serious problem of federal income taxes.

On these facts the Tax Court decided that, during the years in question, taxpayer and his wife "did not really and truly intend to join together for the purpose of carrying on the theatre business as partners" in the operation of the Park Theatre.

It will be seen that, apart from pledging her credit (such as it was), taxpayer's wife contributed not a dollar to the capital of the business, nor did she participate in its management. Her services were in the nature of those of an employee with a moderate salary or those of a devoted wife. Hardly, in any sense, were these services of the kind, type, or importance of the services performed by a partner in a business enterprise.

■ The idea that they were partners seems never to have occurred to either taxpayer or his wife until the wife's brother-in-law suggested that "they should be in partnership" and "returns should be made in partnership." The motivation of the formal articles of partnership seems entirely to have been the minimizing of federal income taxes. The record, apart from these formal articles, discloses no holding out to the public of any partnership.

Counsel for taxpayer attributes little importance to these formal articles and insists that the articles did no more than make explicit what had long been implicit—a genuine partnership between the taxpayer and his wife.

■ Taxpayer seeks support for his contentions in the opinion of Chief Justice Vinson in the well known case of Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, which stated, at page 742, 69 S.Ct. 1210, at page 1214, the critical test of the validity of a family partnership for federal revenue purposes is: "* * * whether, considering all the facts—the agreement, the conduct of the parties and execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purpose for which it is used, and any other facts throwing light on their true intent—*the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."* (Italics supplied.)

We cannot say that the Tax Court did not apply this test in reaching its decision in the instant case. And certainly taxpayer is not helped by Chief Justice Vinson's language in that case, 337 U.S. at page 744, 69 S.Ct. at page 1215: "* * * a court's determination that the services contributed by a partner are not 'vital' and that he has not participated in 'management and control of the business' or contributed 'original capital' has the effect of placing a heavy burden on the taxpayer to show the bona fide intent of the parties to join together as partners."

Nor can we agree with taxpayer's contention that this case is as strong in favor of the taxpayer as Funai v. Commissioner, 4 Cir., 181 F.2d 890, decided by our Court in which we held, reversing the Tax Court, that a partnership actually existed. The factual differences between the two cases are readily apparent in the closing paragraph of our opinion in the Funai case, 181 F.2d at page 895: "Some of the capital which went into the original business originated with Viola. She worked long hours, contributing vital services, hired employees, made purchases and sales and looked after the cash. She had with her husband equal rights of control over the profits of the business and she was held out to the public as a partner. Written partnership agreements were entered into, partnership income tax returns were filed from 1940 through 1944 and accepted by the Commissioner until 1942, and business licenses were taken out, including Viola as a party. Viewing the totality of the facts, we find no sham or lack of economic reality in this partnership between husband and wife but, on the contrary, a bona fide intent, actually effected, on the part of both husband and wife, to join together for the purpose of carrying on the business as a partnership, with the attendant consequence of sharing the profits and losses. The decision of the Tax Court is reversed."

We find nothing to change our views in the cases cited in the reply brief of the tax-

payer. Powers v. Commissioner, 312 U.S. 259, 260, 61 S.Ct. 509, 85 L.Ed. 817; Bogardus v. Commissioner, 302 U.S. 34, 38, 58 S.Ct. 61, 82 L.Ed. 32; Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 490, 57 S.Ct. 569, 81 L.Ed. 755; Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343; Cecil v. Commissioner, (decided by our Court) 100 F.2d 896, 900.

The decision of the Tax Court of the United States is affirmed.

Affirmed.