**KUCK et, Appellees, v. SOMMERS et, Appellants.**

Ohio Appeals, Third District, Mercer County.

No. 485.   Decided August 28, 1950.

Robert D. TouVelle, Myers & Myers, Celina, for appellees.

LeRoy E. Eastman, Toledo, Don W. Sears, Columbus, Leo H. Faust, Troy, Ferdinand E. Warren, Leipsic, for appellants.

(MONTGOMERY, PJ, of the Fifth District, DOYLE, J, HUN-SICKER, J, both of the Ninth District, sitting by designation in the Third District.)

## OPINION

By DOYLE, J.

To here review the lengthy pleadings and the hundreds of factual situations to which one's attention is directed in this appeal on questions of law and fact, would be productive of no worthwhile result, so far as making clear the real issues and the equitable principles which are to be invoked for a decision in this case. They are well-known to counsel and need not be here repeated. It is sufficient, we think, to say that appellees (plaintiffs below) are seeking, by way of judgment in this court, to establish a trust for their benefit in property bought at a mortgage foreclosure sale in the Common Pleas Court of Mercer County by one F. G. Fisher, trustee. The factual question is presented as to whether the said Fisher bought as trustee for one Frank Sommers, or whether he did, in fact or by way of a legal cord which bound him to these appellees, purchase the property for their use and benefit.

The prayer of the second amended petition is as follows:

"Wherefore, plaintiffs pray that said defendants, and each of them, be required to answer * * * and that they be required to account to plaintiffs for the monies, properties and assets, conveyed by the said F. G. Fisher, trustee, to the defendant The Producers Creamery and Cold Storage Company, and to account for all monies received by them, or any of them, as the result of the use of said monies, property and assets. That said conveyances, made by said F. G. Fisher, trustee, of the title to the chattel property and the title to the real estate to said defendant The Producers Creamery and

Cold Storage Company, be set aside, and that said defendants, and each of them, be held as trustees of said property for the plaintiffs, and for all other and further proper relief in equity."

It appears that The Producers Creamery and Cold Storage Company was a corporation organized in 1934 as a farmers' "co-operative," and practically all of its shareholders were farmers. With but few exceptions, its business was managed and controlled by officers and directors who were farmers. It engaged in the business of processing milk and other dairy products, and the cold storage of foods. From the start the company was embarrassed with financial difficulties, and as time went on and its business grew, the company became heavily indebted to many individuals and corporations. Among the individuals who gave of their money and credit were I. E. Crampton (now deceased and appearing herein through personal representatives), L. M. Otis, Raymond A. Younger and E. R. Kuck, appellees herein, and Frank Sommers, F. G. Fisher and H. C. Bowman, three of the appellants herein. These men, as individuals or in combination, loaned their money and extended their credit to the company, although they, in most part, had no substantial financial interest in it. They were residents of a proud community in a prosperous Ohio county, and, seemingly, gave financial help to preserve a growing local business, and to save harmless and to restrain from legal action local banking institutions which had extended credit to the company. Some of these men were directors or officers of the local banks. Eventually their claims as a whole exceeded $150,000.

In September, 1939, a time when the company was heavily indebted to these men, in consideration of $15,000 additional money provided by this group to meet current expenses, the company adopted, on September 5, the following resolution:

"Whereas in order to supply additional temporary working capital to Producers Creamery & Cold Storage Company, the sum of Fifteen Thousand ($15,000.00) Dollars has been borrowed from The First National Bank, Celina, Ohio, by a group of individuals interested in the advancement of the Company which group has designated L. M. Otis and F. G. Fisher to act as its trustees, and said sum has been placed to the credit of this Company to be used exclusively to meet the payroll of Sept. 15th, 1939.

"Now therefore be it resolved by the Board of Directors of said Producers Creamery & Cold Storage Company that from and after said date of Sept. 15th, 1939, all accounts receivable for merchandise processed and sold and all inventory of

merchandise as processed be, and the same hereby are, transferred, assigned and set over to said L. M. Otis and F. G. Fisher, trustees, day by day as they become available to be applied by said L. M. Otis and F. G. Fisher, trustees, to the payment of the operating expenses of this Company and the repayment of said amount so loaned to this Company until such a time as said amount or additional amounts subsequently advanced by said group be paid in full.

"Be is further resolved that until said amount so loaned the Company be repaid, no disbursement of funds of this company by check or otherwise shall be made unless and until said disbursement or check shall have received the approval of the executive committee of said group now consisting of said F. G. Fisher, H. C. Bowman and E. R. Kuck, or a majority of them or their successors duly appointed by said group and certified to this Company.

"Be it further resolved that until such time as said amount so loaned be repaid, the management of this Company shall consult with said group of individuals when assembled in meeting and with said Executive Committee in the interim and so far as possible carry out the recommendations and advice of said group as to management policies and practices so far as said group shall recommend and the Board of Directors of this Company shall approve nothing herein contained being intended, nor shall be construed to derogate from the due and legal powers and duties of said Board of Directors.

"Be is further resolved that the President and Secretary of this Company be, and they hereby are, authorized, directed and empowered to sign all contracts, instruments and assignments and to do and perform all things necessary to carry out the purposes hereof."

Because of threatened legal action by creditors against the Company shortly before August, 1940, the group of men heretofore mentioned sought and received legal advice relative to further steps to be taken to protect their interests as creditors. As a result thereof, the Company executed a note payable to the creditors comprising the group (except Younger) in the amount of $125,000, and secured it by a mortgage on its real estate and by a separate mortgage on its personal property. Each of the mortgages provided for the appointment of a "trustee" for the mortgagees, with the following stipulated power: that he "shall have all the authority and power and rights conferred in this mortgage upon the mortgagees."

Pursuant to this authority, Fred G. Fisher was appointed, by written instruments, "trustee," by a majority vote of the mortgagees, as therein provided.

By resolution of November 6, 1941, the Company cancelled the assignment claimed to exist by virtue of the action taken on September 5, 1939, and in its resolution stated "the intent being to authorize the officers of this corporation to again handle its own finances in order to see that the income of the corporation is used to pay primary indebtedness according to the list marked 'Exhibit A' and attached to the trustee's instructions, rather than money advanced by the group."

By this action of the Company and for other reasons, the group creditors were provoked into an immediate foreclosure of their real estate mortgage. This action was filed on November 17, 1941, and a receiver was appointed to take charge of the mortgaged assets of the Company. Subsequently, on June 4, 1942, a judgment in the sum of $119,592.72 was entered in favor of the group and against the Company on the note. On this date, also, there was directed an order of sale of the property under the foreclosure proceedings.

On July 6, 1942, the property was sold to F. G. Fisher, trustee, for the sum of $300,100, which bid was subsequently accepted by the Court of Common Pleas. The receiver, however, was directed to continue to operate the business of the Company under the direction of the court until the purchase price was paid or secured to be paid per agreement with the court. On or about September 1, 1942, the balance of the purchase price was paid, and the property was conveyed by the receiver to F. G. Fisher, trustee, the sole bidder.

In addition to cash payments made on the purchase price, some of which came from Frank Sommers personally, and some from the liquidation of assets after the date of sale in July and collected by the receiver, there was deducted from the bid price the balance due on a note secured by a first mortgage of $67,500 to the Columbus Mutual Life Insurance Company, plus $119,592.72, the amount due on the note and mortgage held by the so-called group.

The mortgage note to the insurance company was signed by the Company as well as by all of the individuals here in litigation as comakers, except E. R. Kuck, who, with others, guaranteed payments by endorsement.

The credit taken for the balance due of $119,792.72 on the judgment, was sanctioned by a formal written instrument executed by the judgment creditors. This instrument is in the following language:

"WHEREAS, L. M. Otis, John T. Gibbons, F. G. Fisher, E. R. Kuck, H. C. Bowman, I. E. Crampton, and Frank Sommers, as parties plaintiff filed their certain suit in the Common Pleas Court of Mercer County, Ohio, against The Producers Creamery and Cold Storage Company, a corporation,

being case No. 13490, in said Court, praying for judgment and foreclosure of a mortgage given by The Producers Creamery and Cold Storage Company to said parties plaintiff, said mortgage being recorded in Vol. 105, page 603, of the mortgage records of Mercer County, Ohio, and at Vol. 170, page 590, of the record of mortgages, of Darke County, Ohio, and,

"WHEREAS, in connection with said proceedings and on motion of the plaintiffs, one Reed Shafer, was appointed receiver to operate and conduct the affairs of said defendant Company, and,

"WHEREAS, pursuant to the order of the Court, the receiver, Reed Shafer, to satisfy the judgment of the plaintiffs, and other debts and obligations of the defendant Company, sold the property and assets of the defendant Company on July 6th, 1942, to F. G. Fisher, one of the plaintiffs herein, for the sum of $300,100.00, and,

"WHEREAS, said F. G. Fisher, the purchaser, desires the full co-operation of all of the plaintiffs and parties having a financial interest in said mortgage, and their aid and assistance in refinancing said purchase, we, the undersigned, parties plaintiff, in consideration of $1.00 to us paid, respectively agree that said F. G. Fisher be and he hereby is authorized to receipt to said Reed Shafer, receiver, for the sum of said judgment entered in said cause, being case No. 13490, in the Common Pleas Court of Mercer County, Ohio, in the sum of $119,592.92, with interest as evidenced by said judgment entry, less payments made by the receiver since said date as follows:

"To The Peoples Bank, Coldwater, Ohio, interest.

"To The First National Bank, Cincinnati, Ohio, int. and that credit for said sum be allowed on the purchase price.

"IN WITNESS WHEREOF, said parties plaintiff have hereunto set their hands to duplicate copies of this agreement, this 13 day of July, 1942."

At about the time of the conveyance of the assets of the Company to the purchaser, a new corporation was formed, and, with the assets conveyed to it by the purchaser Fisher, the business was continued—which, as time elapsed, became exceedingly successful.

The foregoing recital is but a meager account of the many hundreds of facts developed in the evidence; and the sole purpose of stating them is to give but a general idea of the litigation under consideration.

The appellees, in the presentation of their claims, have adopted three separate theories which they assert entitle them under principles of equity to now participate as shareholders in the assets purchased at the receiver's sale.

They specifically claim "that an express trust, with Mr. Fisher as the trustee, was created in favor of the group, in September, 1939, by action of the Old Company in transferring and assigning all of its accounts receivable and processed merchandise to Mr. Fisher and Doctor Otis in trust for the benefit of the group, together with complete control of its funds to the executive committee of the group, and the subsequent assumption by Fisher, with the consent of the Old Company and the group, of the control of the property as well as all of the right so assigned and the authority in connection therewith so conferred by said assignment."

With great care we have analyzed the evidence bearing upon this claim, ever conscious of the requirement that, if third persons are to become trustees, the transfer of the title to property constituting the trust res must be actual and the formalities necessary to convey the title to real or personal propery from one to another must be complied with. We fail to find any evidence of the transfer of title to the claimed trustee of any of the accounts receivable or processed merchandise. In fact, the resolution itself, even if it had been delivered to the trustees, does not effect a transfer of the property, as possibly might a self-executing instrument, because the resolution itself provides the way and manner in which the property should be transferred, in the following language:

"* * * the President and Secretary of this Company be, and they hereby are, authorized, directed and empowered to sign all contracts, instruments and assignments and to do and perform all things necessary to carry out the purposes hereof."

There is no evidence indicating that these officers ever, by formal conveyance or otherwise, transferred title to the property under the authority given. There is no evidence that the so-called trustees ever took possession of the property in question. To the contrary, these assets of the company served and were used in the normal operation of the business. The evidence indicates only that the effect of the resolution and contemporaneous arrangements was to permit Mr. Fisher to approve, by initial, the disbursement of the funds of the company through the medium of bank checks, and thereby control the expenditures to a certain extent. Certainly, thus far, the facts shown to exist do not prove the existence of an express trust. The title and possession of the assets in question were always in the corporation.

The appellees, in continuing their claims, assert:

"The express trust so created continued uninterrupted according to its terms and purpose, and Fisher acted as the

trustee thereunder, until it was violated in September, 1942, by Fisher acting in concert with Sommers and Bowman, although the trust res and the authority of the trustees were enlarged by the appointment of Fisher as trustee for the group under the provisions of the mortgages of August 1 and 2, 1940, and Fisher's acceptance thereof and his assumption of the duty to do all things necessary in behalf of the group to protect their rights under the mortgages and their agreement to do nothing in their own behalf, either individually or as a group, except by and through Fisher as their trustee. The broad general powers of Fisher as trustee for the group were more specifically expressed, but not altered or limited, by the agreement or memorandum of October, 1941, wherein Fisher declared the trust, by the meeting of November 11, 1941, and by the declarations of Fisher at the time of the agreement of June 13, 1940, by means of which he secured the execution of said agreement by the plaintiffs."

The mortgages given to the creditors, herein litigating, in security for the note of the company covering its indebtedness to them, to which reference has been heretofore made, contained the following language:

"It is further understood and agreed that the word mortgagee or mortgagees shall include any person designated in writing by the mortgagee or mortgagees to act as trustees for the mortgagee or mortgagees and said trustee, so designated in writing to the mortgagor, shall have all the authority and power and rights conferred in this mortgage upon the mortgagee or mortgagees. The mortgagee or mortgagees reserve to themselves the right to change the trustee at any time or have no trustee whatsoever, providing the mortgagor and mortgagors shall be notified in writing, the desire of the mortgagee and mortgagees."

(The language quoted above is taken from the real estate mortgage. The language used in the chattel mortgage is substantially the same.)

At the time of the execution of the chattel mortgage, the following separate instrument in writing was signed by each of the mortgagees:

"We, the undersigned, being at least a majority of the mortgagees named in a chattel mortgage executed by The Producers Creamery and Cold Storage Co. of Celina, Ohio, under date of August 1, 1940, do hereby select and appoint Fred G. Fisher as the trustee in our place and stead to take possession of the property enumerated in said mortgage in our behalf and in our stead. In accordance with the terms of said chattel mortgage, we hereby designate said Fred G.

Fisher, as trustee aforesaid, to do all things necessary and act in our behalf under said mortgage hereby ratifying, affirming and approving all of the acts and things done by Fred G. Fisher, as such trustee, which have already been done by Fred G. Fisher, in his capacity as trustee. We also agree that Fred G. Fisher, as such trustee, shall act solely in our behalf and that we, either as a group or as individuals, shall exercise no rights under the aforesaid mortgage only by and through Fred G. Fisher as trustee. * * *

"(Signatures)"

The following instrument was also executed and signed by the mortgagees:

"Celina, Ohio, August 2, 1940.
"The Producers Creamery and Cold Storage Co.,
"Celina, Ohio.
"Gentlemen:

"In accordance with the terms of the mortgage executed by you under date of August 2, 1940, to the undersigned as mortgagees, we have selected and appointed Mr. Fred G. Fisher as trustee of our interests as mortgagees to act in our behalf in accordance with the terms of said mortgage.

"Please be advised that Mr. Fred G. Fisher will act as such trustee during the effective period of the mortgage or until this designation is cancelled by a written document signed by at least a majority of the undersigned.

"(Signatures)"

As with many legal questions, great difficulty in the law of trusts lies in confusion and misuse of terms. The language employed in the instruments set forth above designates Mr. Fisher as "trustee." But, as stated before in this opinion, there can be no trust without a trust res or corpus, and certainly the language used in the instruments, or any other conduct of the mortgagees, does not convey or deliver to Mr. Fisher the title to any property, either legal or equitable. Undoubtedly the language and conduct of the parties is sufficient to create an agency, and thus far such is the only status of Fisher, excepting only his standing as a mortgagee in his own right.

Agencies and trusts resemble each other in many respects, in that both are relations of trust and confidence, but their points of difference are marked. An agent is ordinarily not the owner of property for the benefit of his principal, while a trustee always holds the title to property for his cestui que trust. See 1 Restatement of the Law of Trusts, Sec. 8. We find no evidence in the entire record which would permit this court to rule that an express trust was ever created.

The mere statement of a person that he holds property as trustee for someone else is not sufficient to establish an express trust, if in truth and in fact he does not have the title to or ownership of the property for which he declares himself trustee for the benefit of someone else. Nor will the use of the term "trustee" establish an express trust in property when there has been no conveyance of title to property to a third person "trustee" by a settlor.

Thus far in our discussion of the questions presented, we are of the opinion that Fisher acted in the capacity of agent only, and that such was his intended legal status by all of the parties herein.

It is proper, we believe, to make the following observation in connection with the claimed assignment of the mortgages to Fisher. We find no evidence showing that the primary obligation—the debt as evidenced by the promissory note—was ever assigned, endorsed or transferred to Fisher, the asserted trustee. In 27 O. Jur., Mortgages, 469, Sec. 244, appears the following:

"A mortgage given to secure a debt has no determinate value apart from the debt, and as distinct from it, is not a fit subject for assignment. (Kernohan v. Manss, 53 Oh St 118.) A mortgage being a mere incident, an assignment thereof will not, in law, carry with it a transfer of the debt, at least where the intent is not to transfer the debt at law, a negotiable note being retained by the assignor."

See also, 37 Am. Jur., Mortgages, Sec. 1204.

The failure to transfer or assign the debt to the claimed trustee, Fisher, it would seem, is added evidence that it was never the intention of the mortgagees to make Fisher anything other than their agent, clothed with authority to service and look after their interests.

In connection with the above observations, caution must be used to not confuse the statements there made with the rule of law governing the transfer of a debt. This rule of law is, as we understand it, that, where a note secured by a mortgage is transferred, as by endorsement, so as to vest the legal title to the note in the transferee, such transfer operates as an equitable assignment of the mortgage, even though the mortgage is not assigned or delivered.

The record also discloses that the mortgage was foreclosed and judgment taken on the note in the names of the principal creditors, and not by Fisher, as trustee for the group.

It is further claimed by the appellees that—

"The agreement of July 13, 1942 (heretofore set forth), and the statements of Fisher that induced the execution of that

agreement, in and of themselves, constitute a declaration of an express trust for the benefit of the group, in view of the fact that Fisher as the successful bidder then had the equitable title to the property sold by the receiver, coupled with the right to acquire the full legal title thereto; something that had economic commercial value and was assignable.

"Not only did an express trust arise, as stated above, but the evidence also shows a purchase-money resulting trust, based on the confidential relations between Fisher and the group and the contribution by the group of a definite and ascertainable part of the purchase money, by reason of their agreement to permit the continuance of their indebtedness to the Columbus Mutual Life Insurance Company amounting to $67,500 and the surrender of their judgment for more than $120,000."

As stated before, the bid price for the property made by Fisher on July 6, 1942, was in the amount of $300,100. Twenty-five thousand dollars of Mr. Sommer's money, in the form of a certified check, was deposited with the bid. Following this deposit, the court allowed a period of time for the final payment, and under the terms of the sale the purchaser was given the accounts and the business as of the date of the sale, although the receiver was to continue to operate the plant until the time of final confirmation.

Between the date of the sale and its confirmation, $37,000 came into the hands of the receiver out of the business, which was applied on the purchase price. Under the terms of the sale, this money was to belong to the purchaser in the event of a final confirmation. It therefore was properly applied to the purchase price as money belonging to the purchaser. It represented a part of, or the augmentation of a part of, the assets purchased. In addition to these cash payments, an additional sum of $50,358.53 of cash belonging to Mr. Sommers, or cash for which he was personally responsible, was paid on the purchase price. It thus appears that Sommers paid personally in cash, $75,358.53, plus $37,000 in cash (the latter representing cash owned by the purchaser), or a total of $112,358.53. The balance of the purchase price was paid by a credit on the purchase price of two prior liens—i. e., (1) a mortgage lien in the amount of $67,500 to the Columbus Mutual Insurance Co., and (2) the judgment lien of $119,592.73 in favor of the creditors' group.

In analyzing the legal effect of the abatement in the purchase price to the extent of the amount of the two items mentioned, we determine that the purchaser acquired the property subject to these claims, and, by his purchase, assumed

personal liability for their payment. We find nothing in the agreement of July 13, 1942, heretofore set out, which indicates that the members of the group of creditors intended that their respective interests in the judgment were to be cancelled or discharged and in consideration therefor that they were to have an interest in the property. In fact, the entire record indicates a hope on the part of all of the creditors that some way could be found whereby they could get their money back and be relieved from further liability. And as a matter of fact, at the time of the institution of this suit, their hopes had been realized, because they had been paid and were no longer liable for any of the obligations, including the note to the Columbus Mutual Life Insurance Company.

An extended discussion at this point on resulting trusts seems unnecessary. Professors Bogert and Scott have well covered the field, and the fundamental principles are well known to counsel. It is well, however, to call to mind the following principle so well ingrained in this field of the law: that the first fundamental fact which a claimant relying on a resulting trust of the kind herein claimed, must prove, is that he paid all or a part of the purchase price. The payment of the claimant's money or property must have been with his consent, express or implied. The mere loan of money or the loan of credits to a purchaser, by a claimant of a resulting trust in his favor, does not create such a trust. In the instrument of July 13, 1942, supra, there is nothing which indicates a payment, through the release of a debt, on the purchase price. The debt still remained. Nor is there any other evidence in the record to indicate any such intent.

The appellees further claim "that the property purchased by Mr. Fisher at the receiver's sale should be impressed with a constructive trust in favor of the plaintiffs, arising from the confidential relationship that existed for more than three years between Mr. Fisher and the group, * * * the representations by Mr. Fisher to the plaintiffs that he was acting and would continue to act as their trustee, their reliance on such representations and their belief that Mr. Fisher was acting as their trustee, the control that Fisher thereby secured over their property and rights, the transfer and conveyance of the assets of the old company to 'F. G. Fisher, trustee,' the failure of Mr. Fisher under all of the circumstances to deal fairly with the plaintiffs and to advise them fully of the so-called 'Sommers-Fisher trust' in order that plaintiffs could have protected their rights, and the fact that the defendants derived large profits by abusing the trust and confidence reposed by plaintiffs in Mr. Fisher."

It is said that a constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired under such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

Here it is claimed that Fisher, the purchaser, violated his fiduciary and confidential relations with the group, and that he, in conjunction with Sommers, took an unfair advantage which now unjustly enriches him or his successor in title, at the expense of former creditors of the old corporation.

In so far as this claim is concerned, the evidence points to the fact that, while for several years Fisher had acted in a confidential and fiduciary capacity toward the members of the group of creditors as an agent in assisting them to safeguard their hazardous financial transactions, at the time of the appointment of the receiver by the Court of Common Pleas, his agency had terminated, and the affairs of the company and its assets and liabilities were under the guidance and protection and in the custody of the court and its receiver.

From this time on, it was the hope of all that an advantageous judicial sale of the property could be made. Through this medium it was apparently thought by all of the group of creditors that they could be reimbursed and relieved of further liability. The operations of the business by the receiver, under the authority and direction of the Court of Common Pleas, and the nature and status of debts and assets of the company, were open for inspection by any one who cared to investigate. There is no evidence indicating the concealment of any material fact.

It is indeed a rule of law that a person in a fiduciary capacity to another who purchases property for himself, may be chargeable as a constructive trustee of the property, even though he purchases it from a third person and not from himself as fiduciary. He is chargeable as a constructive trustee when he purchases for himself individually, property which he should purchase for the beneficiary. This is true where the fiduciary is an express trustee, and it is also true in the case of other fiduciaries, such as executors and administrators, guardians, partners, agents, etc.

The simplest situation arises where the fiduciary is **under an affirmative duty** to purchase the property for the beneficiary, and he not only fails to purchase it for the beneficiary but purchases it for himself. And this is so even though the fiduciary would not incur a liability to the beneficiary for his failure to purchase the property. It is sufficient that he is

under a duty if he purchases it at all to purchase it for the beneficiary.

There are many authorities with which we do not disagree which hold that if one is induced to confide in the promise of another that he will acquire property for him, and is thereby led to do what otherwise he would have foreborne, or to forebear what he contemplated to do in order to acquire such property, and the promisor acquires the property in his own right or as agent or trustee for someone else, the denial of the confidence is such a fraud as will operate to convert the promisor into a trustee ex maleficio and a constructive trust arise thereby. No one can acquire rights in property antagonistic to the person whose interest he has committed himself to protect, nor to hold any benefit acquired by fraud or breach of duty.

In our appraisement of the evidence touching the claim of a constructive trust, we find no evidence indicating a duty on the part of Fisher to purchase for the group. He was free to purchase for himself or as an agent for anyone else. There was no agreement, either express or implied, between Fisher or Sommers and the other members of the group that Fisher was to raise the purchase price and buy for their benefit. Each member of the group could have bid and purchased the property for himself, had he been able and so desired. At the time of the sale, Fisher was not an agent for anyone other than Sommers.

However, assuming that Fisher was the agent for the group at the time of the judicial sale, he cannot be held as a constructive trustee if, before purchasing the property, he gave the principals an opportunity to purchase and they declined to do so. And in this connection, by way of repetition perhaps, we find no evidence to establish the fact that any one or more members of the group, except Sommers, ever intended to buy and pay for, with his money or credit, the property later sold to Fisher, although they were at all times in a position to know, and presumptively did know, the details of the foreclosure action.

Under such circumstances, we fail to find that the purchase by Fisher was in violation of any duty of his to purchase for the group.

As a general proposition of law, an agent is required to use good faith in dealing with property of his principal, but this duty does not necessarily impose upon him additional duties as a fiduciary in matters unrelated to the agency. In order to charge an agent as a constructive trustee, there must be a connection between the scope of his duties and the trans-

action in which the agent seeks to profit; also, it is recognized as the sounder view that a principal cannot hold his agent as constructive trustee if the agent, before purchasing the property, gave the principal an opportunity to purchase it and the principal declined.

The record does not show that the group or any of its members were misled by Fisher to the extent of forebearing to purchase the property for themselves. They were content at the time of the judicial sale to have it sold to Fisher for the benefit of Sommers, and thereby create an avenue of escape from their financial involvement.

While the foregoing statements are rather lengthy, they cover but a small part of the factual and legal problems presented. We think, however, that what has been said is sufficient to show that the members of this court do not find from the evidence presented the existence of either an express trust or a resulting trust. Nor does the evidence justify the finding that a constructive trust should be impressed upon the property. For these reasons the claims of the plaintiffs (appellees) must fail for lack of proof.

A decree may be drawn for the appellants.

MONTGOMERY, PJ, and HUNSICKER, J, concur.