## TRESSLER v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6595.

United States Court of Appeals
Fourth Circuit.

Argued June 15, 1953.

Decided July 31, 1953.

---

Joseph A. Fitzsimmons, Fort Lauderdale, Fla., for petitioner.

George F. Lynch, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Robert N. Anderson, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This is a petition to review a decision of the Tax Court sustaining a deficiency assessment in the amount of $3,219.65 against the petitioner, S. B. Tressler, for individual income taxes for the taxable year 1943. The deficiency arises principally from a determination by the Commissioner of Internal Revenue that $13,661.70, reported by the taxpayer as royalties paid for coal taken from his Tressler Mine in Barbour County, West Virginia, by Tressler Coal Mining Company, of which the taxpayer was president and a principal stockholder, was in fact dividends paid by the Company which actually owned the mine thus disentitling taxpayer to a $4,981.50 allowance for depletion claimed pursuant to § 23(m) of the Internal Revenue Code, 26 U.S.C.A. § 23(m).

Also included are smaller deficiency items resulting from the Commissioner's disallowance of alleged charitable contributions totaling $425 claimed as a deduction under § 23(o) of the Code, and from disallowance of credits for dependency pursuant to § 25(b) (2) (A), in the amount of $700 for taxpayer's aged mother for 1942 and 1943, and $350 for his minor son in 1943. As to these latter items the Tax Court found that taxpayer's gifts of $200 each to his two widowed nieces were nondeductible personal gifts, and that taxpayer had failed to meet the burden of proof that he was the chief support of his mother and son during the periods in which dependency was claimed.

The Tax Court held that the Commissioner's determination of deficiency for the year 1943 was correct, and that it was not barred by limitations because taxpayer had executed a consent to extension of time for assessment.

The taxpayer makes the comprehensive contention that the entire deficiency assessment is barred by limitations for two reasons. It is said (1) that the deficiency was based upon his 1942 return which was filed on March 6, 1943, whereas notice of the deficiency was not sent to him until May 27, 1949, that is, after the expiration of the five year period of limitations provided by § 275(c) of the Internal Revenue Code, 26 U.S.C.A. § 275(c); and (2) that even as to the tax year 1943 the assessment was barred because the return for 1943 was filed on March 14, 1944 while the assessment was not made until May 27, 1949, nearly a year after June 30, 1948 to which date the time for making the assessment had been extended by the only waiver signed by the taxpayer.

The first reason is not tenable because it is based on the erroneous assumption that the Commissioner assessed a deficiency against the taxpayer for the year 1942 whereas the assessment related to the year 1943. It is true that in order to determine the taxpayer's liability for the year 1943 the Commissioner made certain adjustments and additions to the income for 1942, as shown by the taxpayer's return for that year; but this was done under § 6(b) of the Current Tax Payment Act of 1943, 57 Stat. 126, 26 U.S.C.A. § 1622 note, which had effect of discharging the taxpayer from liability for the 1942 tax as of September 1, 1943, except that interest and additions to such tax should be collected at the same time and in the same manner, and as part of the tax for the year 1943. In

other words, the additions to the taxpayer's 1942 liability as the result of the Commissioner's recomputation resulted only in the determination of a deficiency for the year 1943, so that if the assessment was in time with respect to the tax for the year 1943 it was not barred by limitations. See Carpenter v. Commissioner, 10 T.C. 64; Todd v. Commissioner, 10 T.C. 655; Snite v. Commissioner, 10 T.C. 523, affirmed on other grounds, 7 Cir., 177 F.2d 819.

The second reason for the defense of limitations depends upon whether the taxpayer not only executed a waiver on February 5, 1947 extending the time for making an assessment until June 30, 1948, as he admits, but also executed an additional waiver on May 26, 1948, extending the time of making an assessment until June 30, 1949. The Commissioner offered both waivers in evidence at the trial in the Tax Court. The taxpayer was asked to identify his signature on the second waiver and replied that it looked very much like his signature and he thought he had signed the paper but could not be positive until he saw the copy in his file. He did not deny the authenticity of the waiver, and it was admitted in evidence.

On this appeal the taxpayer now offers to prove that he did not sign the second waiver. He has included in his brief a copy of a motion with exhibits which he filed in the Tax Court on March 18, 1953, after the pending petition for review had been filed in the Tax Court on January 8, 1953. In his motion he requested the court to send to this court the original tax waivers purporting to bear his signature in order that the signatures on the two waivers may be compared. The exhibits accompanying the motion included the written opinion of a handwriting expert that the signature on the second waiver was not written by the person who signed the first, and also included a letter of April 21, 1948 from the Treasury Department requesting an extension of the period of limitations and enclosing three unsigned copies of waiver to be used for that purpose. The unsigned waivers were offered as evidence tending to show that the taxpayer did not execute the second waiver.

The Tax Court denied the motion; and we think that this action was completely justified. The taxpayer previously had ample opportunity to prove that the signature on the second waiver was spurious if he desired to do so. After the first hearing of the case on January 19, 1950 the Tax Court entered a decision on January 29, 1951 and thereafter, on February 28 and March 6, 1951, the taxpayer filed various motions to vacate the findings of the court and also for reconsideration and further hearing. On May 16, 1951 the court vacated its previous finding and granted a further hearing to enable the taxpayer to submit certain proof which he had inadvertently failed to furnish at the first hearing. On June 6, 1952 new findings and a new opinion were filed; and subsequently, on August 6, 1952, the taxpayer again moved for a reconsideration, which was denied, and the decision of the court was filed on October 10, 1952. The petition for review was filed January 8, 1953, and on March 18, 1953, the taxpayer filed the aforesaid motion requesting the Tax Court to send to this court the waivers and exhibits above described.

In all of the proceedings subsequent to the first decision of the Tax Court and prior to the motion of March 18, 1953, the taxpayer made no mention of the second waiver and no offer to introduce newly discovered evidence in relation thereto. More than three years elapsed between the first hearing of the case and the motion of March 18, 1953, and consequently it is obvious that the taxpayer did not act with due diligence in his effort to secure a new hearing on the question of the authenticity of the second waiver, and he does not now offer to explain why his present action in this respect could not have been taken at an early date. The taxpayer himself did not deny his signatures when he was shown both waivers at the first hearing.

 It is difficult to understand the basis of the taxpayer's present contention. If it be that the Tax Court erred in failing to reopen the case and take additional testimony as to the authenticity of the second waiver, the contention must fall because the circumstances make it clear that the

Tax Court acted within the limits of its discretion; and if the contention be that the case should be remanded to the Tax Court to grant a hearing on a point not heretofore considered, it is likewise untenable. Ordinarily an appellate court does not give consideration to issues not raised below; but there are exceptional cases which prompt the court to depart from the ordinary rule, where injustice might otherwise result, and consider questions of law which were neither pressed nor passed upon in the trial court. There is, however, no place for such an exception in this case for the issue is solely one of fact and the taxpayer, although well aware of its importance, made no attempt during a prolonged period to bring it to the trial court's attention. See Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037; Athens Roller Mills v. Commissioner, 6 Cir., 136 F.2d 125.

The heart of this appeal is the ownership of the Tressler Mine. If it belonged to the taxpayer, the sum of $13,661.70 reported by him in his 1942 return as gross income from the royalties for coal taken from the mine, was subject to a deduction for depletion under § 23(m) of the Internal Revenue Code; but if the mine belonged to the Tressler Coal Mining Company, as the Tax Court found, the sum received represented income in the form of dividends or distributions of earnings paid to the taxpayer as a shareholder of the corporation, and he was not entitled to an allowance for depletion. The testimony on the point may be summarized as follows:

Prior to 1935 the mine was owned by the Tressler Coal Company, 60 per cent of whose stock was owned by the taxpayer. In that year the company defaulted in the payment of an outstanding debt which was secured by a deed of trust on its property and foreclosure proceedings took place in the course of which the People's Pittsburgh Trust Company and another, as trustees, bought the mine; and the Trust Company also secured a judgment for $12,000 against the taxpayer and other shareholders as endorsers on the note. This judgment remained unpaid until 1941 when it was satisfied by the taxpayer.

On March 16, 1936 the trustee sold the mine for $7,000 to Frank Marra, a straw man, who was superintendent of the Tressler Coal Mining Company, a separate corporation from the one which owned the mine in 1935. The funds used to pay the purchase price were derived at least in part from the sale of securities registered in the name of the Tressler Coal Mining Company. A deed of the mine from the trustees to Marra was executed on March 16, 1936.

On May 13, 1937, Marra and wife executed a deed of the mine to the corporation. This deed was prepared by the company's attorney, but remained in his possession and was not recorded until years later. On May 14, 1937, the shareholders of the corporation held a meeting, the taxpayer being absent, and authorized the purchase of the mine from Marra and the execution of a mortgage on the mine and other property of the corporation to a bank to secure a loan of $25,000. This transaction, however, was never consummated, since the taxpayer objected when he heard of it and it was abandoned. The mine was completely exhausted by operations in 1942. On September 28, 1946, the corporation conveyed the mine by a deed executed by the taxpayer as president of the corporation to one William T. George; and on October 7, 1946 in connection with this transaction the deed from the Marras to the corporation and the deed from the corporation to George were recorded.

The taxpayer sought to overcome the proof of record ownership of the mine by the corporation by testimony given by himself and the attorney who drew the deeds, tending to show that the mine actually belonged to him. During the period covered by the acquisition of the mine the taxpayer was embarrassed by certain difficulties. He had marital differences with his wife, he was incarcerated from 1936 to 1939 in a federal penal institution, and the judgment of $12,000 held by the trust company against him was outstanding. He endeavored to show that these circumstances explain the transfer of the mine without his knowledge to the corporation rather than to him. There was also testimony by him

and the attorney relating to the source of the funds used to purchase the mine which tended to show that he, rather than the corporation, furnished the funds. Commenting on this testimony the Tax Court said:

"Petitioner has endeavored to overcome this record proof of ownership by his own testimony and the testimony of Marra and one Talbott, the attorney who handled the transaction. The testimony of Marra was vague, indefinite and uncertain. As to many of the materials facts, he had no recollection. His testimony is of little importance except for establishing the fact that he had no legal or other interest in the property and was a mere agent. The testimony of Talbott, the attorney, is likewise hazy. Many of the material details he could not recall. We think his testimony tends to support the documentary proof that the corporation and not the petitioner was the owner of the property.

"The testimony of petitioner was not persuasive. He was evasive and his testimony contradictory. Wholly aside from the fact that during part of the period involved herein petitioner was confined to a federal institution, but based on our observation of him as a witness, we are disinclined to give full credence to his testimony. The fact that at the time the property was purchased in the name of a 'straw man' he had an unsatisfied judgment of approximately $12,000 against him, indicates his inability to purchase the property in question or that he was endeavoring to secrete his property from creditors. That the documentary proof contradicts his testimony in this proceeding is the result of his own choosing. We are, therefore, not disposed to accept his testimony as establishing his ownership of the Tressler Mine in the taxable periods involved. * * *"

■ This finding is binding upon us unless we are firmly convinced that a mistake was made by the Tax Court, and we see no reason to disturb its conclusions under the testimony in this case. See 26 U.S.C.A. § 1141(a); Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A.; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Collamer v. C. I. R., 4 Cir., 185 F.2d 146.

There is clearly no basis for taxpayer's contention that he is entitled to a deduction of $425 for charitable contributions in 1942. The taxpayer testified that in 1942 he gave each of his two widowed nieces approximately $200, and that he made a contribution of an unspecified amount to the Salvation Army. Taxpayer's 1942 income tax return listed the contributions without explanation, and the Commissioner disallowed the entire $425. The Tax Court upheld the Commissioner, except as to $25, representing the difference between the total amount claimed and the amount the taxpayer claimed he gave to his nieces, which the Tax Court allowed as a contribution to the Salvation Army. The taxpayer himself admits that "this holding is very likely correct," but argues that the full deduction should be allowed because the government now grants an automatic 10 per cent deduction in returns based upon tax tables.

■ The taxpayer claimed this deduction for the year 1942 and the provisions of § 23(aa) of the Internal Revenue Code, relating to an optional standard deduction for individuals, which became effective in 1944, have no bearing on the question. Under the rule generally applicable, which is set out in § 23(o), only those charitable contributions are deductible which are made to a corporation trust or community chest fund or foundation created or organized in the United States or in any possession thereof or under the law of the United States, or of any state or territory or possession of the United States which are operated for specified purposes.

Likewise, there is no error in the Tax Court's holding that the taxpayer failed to satisfy the burden of proof that he furnished the chief support of his son during the year 1942, and of his mother during the years 1942 and 1943, and hence was not entitled to the credits for dependency claim-

ed under § 25(b) (2) (A) of the Internal Revenue Code applicable to the year 1942. There is no dispute that the taxpayer, pursuant to a separation agreement with his wife, paid $25 per month for the support of their son, George W. Tressler, during 1942, through November, and that at that time taxpayer gave his son $50 extra, making total payments of $325. The son resided with his mother where his room and meals were furnished him.

It is also agreed that during 1942 and 1943 the taxpayer contributed $50 per month to the support of his aged mother, Katherine Tressler, who resided with the taxpayer's sister in Summerfield, Pennsylvania. The taxpayer's two brothers contributed unspecified amounts toward the support of their mother when they were able.

 Section 25(b) (2) (A) of the Internal Revenue Code, applicable to the year 1942, provides for a credit of $350 for each dependent receiving his chief support from the taxpayer, if such dependent is under 18 years of age, or is incapable of self-support because mentally or physically defective. Regulations 111, § 29.25–26, further provides that in order to claim a credit for dependency, the taxpayer must furnish more than half of the support of such dependents in the period claimed. Clearly the burden of bringing himself within the provisions of the statute and regulations was upon the taxpayer, and the Tax Court was correct in holding that the burden has not been met. It is improbable that the $325 contributed in 1942 by the taxpayer toward the support of his son, who was then aged 16, was sufficient to pay for more than half his care. As the Tax Court stated:

> "* * * The record is silent as to the amount spent for food, lodging or clothing for petitioner's son. It does not appear from whom he drew the major part of the cost of his support for the year 1942. Since he lived with his mother, the greater part of his support may have been furnished by her."

The same considerations apply to the $600 paid by the taxpayer for the support of his aged mother in 1942 and 1943, while she resided with her daughter and was receiving unspecified amounts from her other two sons. There was no showing as to the actual cost of her support or whether the $50 contributed by the taxpayer monthly constituted more than one-half the cost of her support, and for this reason the Tax Court properly sustained the Commissioner's disallowance of a credit.

Affirmed.