RENA B. FARR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39335. Filed June 9, 1955.

M. *Alfred Roemisch, Esq.*, and *Herbert L. Wright, Esq.*, for the petitioner.

*Michael J. Clare, Esq.*, for the respondent.

352

358

OPINION.

Harron, *Judge:* The main issue is whether petitioner's receipt of 100 shares of Realty corporation stock from Motor Sales corporation in exchange for 50 shares of Motor Sales stock, constituted a taxable dividend to the petitioner, in the amount of $44,972.46, under the provisions of section 115 (a) and 115 (g)[1] of the 1939 Code, as the Commissioner has determined, or constituted a tax-free exchange of stock, under section 112 (b) (3),[2] pursuant to a reorganization as defined in section 112 (g) (1) (D).[3]

The respondent makes several contentions, the ultimate contention being that the petitioner's surrender of 50 shares of stock of Motor Sales and her receipt of 100 shares of stock of Realty corporation was "essentially equivalent to the distribution of a taxable dividend" under section 115 (g) (1). Respondent construes the evidence as

---

[1] SEC. 115. DISTRIBUTION BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

* * * * * * *

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

* * * * * * *

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[3] (g) DEFINITION OF REORGANIZATION.—* * *

(1) The term "reorganization" means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *

supporting the view that petitioner owed $6,050 to Motor Sales because she did not transfer the title to 800 East 152d Street to Motor Sales corporation after it was organized; that Motor Sales had made advances of $35,922.46 to petitioner for which she was indebted to Motor Sales; and that Motor Sales, in 1949, paid $3,000 to petitioner to reimburse her for that amount of the purchase price of the Euclid Avenue lot. These three amounts total $44,972.46. The next step in the respondent's theory is that petitioner's surrender of 50 shares of stock of Motor Sales had the effect of wiping out petitioner's indebtedness to it of $6,050, and $35,922.46, and enabling Motor Sales to pay $3,000 to petitioner. It is part of the respondent's theory that the Euclid Avenue lot was purchased by petitioner for herself and that it was not purchased for Motor Sales corporation, and that it never was Motor Sales' property.

Accordingly, the respondent contends that petitioner owned the realty and the building at 800 East 152d Street; that she owned the Euclid Avenue lot; and that she transferred these properties to Realty corporation in 1949. It follows, the respondent argues, that since petitioner, rather than Motor Sales corporation, made the transfers of the properties to Realty corporation there was no reorganization within the scope of section 112 (g) (1) (D), which applies to "a transfer by a corporation of all or a part of its assets to another corporation." Respondent contends that Motor Sales corporation was not "a party to a reorganization" under section 112 (g) (2),[4] and that the exchange of stock of Realty corporation for stock of Motor Sales corporation does not come within the provisions of section 112 (b) (3) because Motor Sales was not "a party to a reorganization."

The petitioner contends that Motor Sales owned the land and building on East 152d Street and the Euclid Avenue lot prior to the alleged reorganization; that there was an exchange by Motor Sales corporation of properties for all of the stock of Realty corporation; that such exchange of property for stock constituted a reorganization within section 112 (g) (1) (D); and that petitioner's exchange of 50 shares of stock of Motor Sales for 100 shares of stock of Realty was a nontaxable exchange under section 112 (b) (3).

The preliminary questions are, therefore, whether the realty at 800 East 152d Street, and the improvements constructed thereon, and the Euclid Avenue lot were assets of Motor Sales corporation prior to the alleged reorganization.

---

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.
   (g) DEFINITION OF REORGANIZATION.—* * *.
   * * * * * * *
   (2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.

Consideration is given first to the question of the ownership of the Euclid Avenue lot which was purchased on September 22, 1947, for $7,000. The evidence establishes that Motor Sales corporation paid for the lot. The corporation treated the property as an asset; it carried it as an asset in its financial statements and tax returns. The fact that Mrs. Farr negotiated for and closed the purchase of the lot is not inconsistent with ownership by the corporation. She was its president. She carried on the negotiations for the lot in such way as to serve the financial interests of the corporation for which she tried to obtain a low price. The lot was purchased in the course of satisfying the requirement of Studebaker that Motor Sales acquire a better location. The motive behind the purchase of the lot was wholly related to the business of Motor Sales. Mrs. Farr did not purchase the lot for herself, or as a personal investment. We are satisfied from the evidence that there was a bona fide intention of devoting the lot to the use of Motor Sales and of obtaining for it the best location for its business. It is true that the lot was not used as a building site but the petitioner has given a satisfactory explanation for the failure of the plan to so use the lot.

The respondent's chief argument is directed to the point that title to the lot was taken in petitioner's name. Petitioner meets this argument with the assertion that petitioner was a trustee for Motor Sales corporation and that there was a constructive trust. The evidence supports petitioner's contention and there is good legal authority which gives support to the contention. Petitioner, as the president of Motor Sales corporation, acted for the corporation, and she acted in a fiduciary capacity. Of course, she was the sole stockholder and the manager of the corporation. Here, however, the evidence does not show any lack of good faith. To the contrary, the conduct of Mrs. Farr was constantly and consistently directed to the affairs and problems of the corporation. She was endeavoring to develop the business, to satisfy Studebaker, and to retain the Studebaker franchise. It is concluded that Motor Sales became the equitable and true owner of the lot on September 22, 1947, and that Mrs. Farr was no more than the trustee of the legal title. 1 Perry, Trusts (7th ed.) par. 166; *Newton* v. *Taylor*, 32 O. S. 399 (Supreme Court of Ohio); *Hasselschwert* v. *Hasselschwert*, 90 Ohio App. 331; *Shaw et al.* v. *Perry*, 58 Ohio Law Abs. 114; *Kucks* v. *Sommers*, 59 Ohio Law Abs. 412, 413. Cases cited by respondent do not apply here, namely, *Lescaleet* v. *Rickner*, 16 Cir. Ct. 461, and *Stockton* v. *Matson*, 15 Cir. Ct. (N. S.) 12. In those cases the parties were not acting as agents and they did not stand in a confidential relationship.

We next consider whether Motor Sales corporation owned the property at 800 East 152d Street and the building which was constructed. Mrs. Farr purchased that lot for $6,050 while she carried on the motor

sales business as a proprietorship and before Motor Sales corporation was organized. She purchased it for the business, the reason being that Studebaker urged her to acquire a better building for the business and she was endeavoring to retain the Studebaker license. The lot was carried on the books of the proprietorship business as an asset at $6,050, and represented part of total assets of $25,000. Upon the organization of Motor Sales corporation, 250 shares of stock having a declared value of $25,000 were issued to petitioner. We are satisfied from all of the evidence that petitioner included the lot in the assets which the corporation took in exchange for its stock. The testimony of petitioner and others that it was understood that the lot became an asset of the corporation is borne out by documentary evidence such as the financial statements of the corporation, the corporation franchise returns, county and Federal tax returns, and minutes of a meeting of the corporation's directors. The corporation paid the taxes on the property.

There is a substantial amount of evidence about the necessity for the corporation's acquiring a suitable building for carrying on its business and about the insistence of Studebaker that it do so. It is made entirely clear that the construction of a building was a condition of keeping the franchise and continuing the business. The corporation constructed the building. It filed the application for a building permit. Michael, the general manager, obtained bids for material and labor; it advanced its funds to pay construction costs. Petitioner acted for the corporation in obtaining a construction loan. Finally, the corporation took possession of and occupied the building, and conducted its business there. It paid for the insurance on the building.

The respondent, in this instance also, attacks petitioner's contention that she was not the true owner of the realty and the building on East 152d Street on the ground that legal title was in her name. We are satisfied from all of the evidence that petitioner was a trustee of the legal title for Motor Sales corporation; that she acted for the corporation and was in a fiduciary relationship to the corporation.

Respondent relies upon *Tressler* v. *Commissioner*, 206 F. 2d 538, in support of his contention that petitioner, rather than Motor Sales corporation, owned the land and building. The conclusion in the *Tressler* case was based upon the record in that case. The taxpayer failed to carry his burden of proof. There was lack of credibility of testimony and inadequacy of proof. The *Tressler* case is distinguishable on its facts.

Respondent argues that petitioner could not have been compelled to convey her legal title to the land at 800 East 152d Street to Motor Sales corporation. He suggests that the Statute of Frauds, Page's Ohio General Code, section 8620, would defeat the corporation's claim to the property.

The minutes of the first meeting of Motor Sales' directors on January 2, 1946, contain petitioner's offer, and the directors' acceptance, to exchange all her proprietorship assets, including the land at 800 East 152d Street, for stock of the corporation. The evidence shows that the corporation paid for the land in full by issuing its stock, that it incurred and paid substantial expenditures in constructing a building on the land; and that it entered into possession of the premises. Upon all of the evidence, we conclude that the corporation could have enforced a claim of ownership of the land and building and that the statute of frauds would be no bar. See *Artcraft Specialty Co.* v. *Center Woodland Realty Co.*, 40 Ohio A. Rep. 125, 178 N. E. 213; *Kemp* v. *Feldman*, 84 Ohio App. 154, 81 N. E. 2d 319; *Schroeder* v. *Schultz*, 24 Ohio Circuit Court Reports (N. S.) 268; affd. 68 Ohio St. 690, 70 N. E. 1130; *Thibodeau* v. *Kevern*, 19 Cir. Ct. (N. S.) 374; affd. 88 Ohio St. 603, 106 N. E. 1064; and *France* v. *McKenzie*, 20 Cir. Ct. 209, affd. 60 Ohio St. 565, 60 N. E. 1132; *Topper* v. *Bohn*, 12 Nisi Prius (N. S.) 177, 22 Ohio Dec. 537. The foregoing applies equally to the Euclid Avenue lot.

Consideration has been given to the matter of various bookkeeping entries which respondent points to as constituting some contradiction of petitioner's claims. They have been satisfactorily explained and are not entitled to much weight in view of the preponderance of evidence in petitioner's favor. On the whole, the bookkeeper made errors due to lack of knowledge of facts, and the errors were promptly corrected.

We recognize that petitioner, as the president of the Motor Sales corporation, might have exercised more care about many formal matters. However, lack of experience rather than lack of good faith is involved. On the whole due care was, in fact, exercised, and the substance of what was done is given weight rather than the lack of form. Furthermore, the intent of the petitioner and her business associates is clear and is borne out by their conduct.

It is held that the two pieces of realty and the building were owned by Motor Sales corporation prior to the formulation and execution of the plan to organize Realty corporation and to effect a reorganization.

The findings and conclusions reached with respect to the above questions having been made in petitioner's favor, the issue of whether there was a reorganization under the provisions of section 112 (g) (1) (D) of the 1939 Code is reached. The ultimate question is whether petitioner's exchange of 50 shares of stock of Motor Sales corporation for 100 shares of stock of Realty corporation is taxable. Petitioner contends that the transaction constituted a tax-free exchange of stock under section 112 (b) (3), pursuant to a plan of reorganization. Respondent contends that the distribution of the stock of Realty to petitioner, a stockholder of Motor Sales corporation, was a taxable

property dividend under section 115 (a) and, also, that the transaction accomplished a siphoning off of earned surplus of Motor Sales to the extent of $39,972.46 plus a redemption of $5,000 of petitioner's stock in Motor Sales.

The entire transaction consisted of two exchanges. Motor Sales first exchanged all of its improved and unimproved realty for all of the stock of Realty corporation. Section 112 (b) (4) is applicable to this transaction if the exchange was made by parties to and in pursuance of a plan of reorganization. The subsequent exchange consisted of distributing the Realty corporation stock to the shareholder of Motor Sales for one-fifth of her stock in Motor Sales. Section 112 (b) (3) is applicable if the distribution of Realty stock for Motor Sales stock constituted an exchange and if the corporations were parties to and the exchange was made in pursuance of a plan of reorganization. See *Chester E. Spangler*, 18 T. C. 976, 983 (acq. 1953–1 C. B. 6), where the same type of reorganization, sometimes called a "split-off," was considered. See, also, *Riddlesbarger* v. *Commissioner*, 200 F. 2d 165; and Rev. Rul. 289, 1953–2 C. B. 37.

Referring to the statutory requirements, we said in the *Spangler* case as follows:

Sections 112 (b) (3) and 112 (b) (4) both require that the exchanges be made in pursuance of a plan of reorganization and involve stocks, securities or property of a corporation a party to a reorganization. A reorganization is defined in section 112 (g) (1) (D) as "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *"

In this case the transaction under consideration meets the above definition in that after the transfer of the real property for the stock of Realty corporation, Motor Sales corporation controlled Realty, the new corporation, by the ownership of all of its stock, and shortly thereafter the shareholder of Motor Sales owned all of the stock of Realty corporation. Sec. 112 (h). Since the exchange was made as part of the plan of reorganization and both Motor Sales and Realty were parties to the reorganization (section 112 (g) (2)), the exchange falls within the terms of section 112 (b) (4) if there are no other requirements.

The second transaction, the stock redemption exchange, was in pursuance of the reorganization. The plan had included the distribution of stock of Realty. Cf. *D. W. Douglas*, 37 B. T. A. 1122. Transfers made pursuant to a plan of reorganization are ordinarily parts of one transaction and should be so treated. *Starr* v. *Commissioner*, 82 F. 2d 964. Since the shares transferred were in corporations which were parties to the reorganization the literal requisites of section 112

(b) (3) have been met. *Chester E. Spangler*, *supra*, p. 984. We now turn to respondent's arguments.

The respondent contends that the exchange of the real properties and the building for the stock of Realty corporation was not attended by a continuity of interest on the part of the person who was the owner of Motor Sales prior to the reorganization (see Regs. 111, sec. 29.112 (g)–1) because, he alleges, the petitioner did not contemplate retaining her interest in the business of Motor Sales after the transaction. The respondent asserts that the employment contract of April 1947 required petitioner to sell part of her stock in Motor Sales to Michael; that the sale of stock to Michael on November 16. 1950, was a fulfillment of that obligation; and that the reorganization and sale were parts of the same transaction. Respondent relies on *Bassick* v. *Commissioner*, 85 F. 2d 8, affirming *Wilbur F. Burns*, 30 B. T. A. 163, certiorari denied 299 U. S. 592. The respondent contends, also, that Motor Sales' exchange of some of its assets for stock of Realty did not have a bona fide business purpose. This contention is intertwined with the contention that there was a lack of continuity of interest; i. e., the respondent alleges that the purpose of the exchanges was to enable petitioner to sell her Motor Sales stock to Michael, and that such purpose was personal and was not "germane to the conduct of the venture at hand * * *." *Helvering* v. *Gregory*, 69 F. 2d 809, 811, affd. 293 U. S. 465.

Upon all of the evidence it is found that neither the contract of employment with Michael nor any discussions between him and the petitioner prior to the reorganization required him to purchase, or petitioner to sell, any Motor Sales stock. After the plan of reorganization was consummated the petitioner remained free to retain her entire interest in Motor Sales, Michael was under no obligation to purchase any interest, and the petitioner alone had the risks and the benefits of Motor Sales' continuing operations. The exchanges in question were not interdependent upon petitioner's sale of some of her stock to Michael. That sale was not made until about 18 months later. The two corporations, Motor Sales and Realty, were in existence and could have continued to operate whether or not a sale of stock was ever made to Michael. See *Scientific Instrument Co.*, 17 T. C. 1253, affd. 202 F. 2d 155; *ACF-Brill Motors Co.* v. *Commissioner*, 189 F. 2d 704, affirming 14 T. C. 263, certiorari denied 342 U. S. 886; and *American Bantam Car Co.*, 11 T. C. 397, affd. 177 F. 2d 513, certiorari denied 339 U. S. 920. We are satisfied from the evidence before us that petitioner's eventual sale of stock to Michael was not made pursuant to an obligation which existed prior to the reorganization, and that it was not so interdependent with the reorganization as to violate the "continuity of interest" test required for reorganizations under section 112 (g) (1).

Consideration has been given to *Bassick* v. *Commissioner, supra*, which is cited by respondent. The *Bassick* case involved section 202 (c) (3) of the Revenue Act of 1921, the predecessor of section 112 (b) (5) of the 1939 Code. The issue was whether the taxpayers, who transferred property to a corporation for its stock, were in control of, or owned, at least 80 per cent of the shares of the corporation immediately after the transfer. They had received for their property 147,500 shares, or 100 per cent of the stock, but prior to the exchange, they had contracted to transfer 65,000 shares, or more than 40 per cent, to a third party. It was held that because a pre-existing obligation to convey the 65,000 shares existed the taxpayers were not in control of the corporation immediately after the transfer, although they might literally have received 100 per cent of the shares. See, also, *S. Klein on the Square* v. *Commissioner*, 188 F. 2d 127, affirming 14 T. C. 786, certiorari denied 342 U. S. 824.

It is not denied by petitioner that the immediate purpose of the transactions in question was to reduce the value of the stock of Motor Sales so as to place a substantial part of petitioner's Motor Sales stock closer to Michael's means in the event stock should be offered to him. The evidence shows, however, that the sale of part of petitioner's stock in Motor Sales to Michael was desired only in order to preserve the Studebaker franchise. The record establishes that Studebaker postponed granting the franchise for more than 1 year, until 1946; that its desire to have a man in control of the dealership was clearly and repeatedly brought to the attention of the petitioner; that Michael and the petitioner were both urged to arrange for a purchase and sale of stock; and that at least one other male purchaser was referred to petitioner by the Studebaker corporation. We are satisfied that petitioner, Michael, and Roemisch, her attorney, reasonably believed that the franchise eventually would be lost unless a man was brought into the business of Motor Sales with petitioner.

Although the presence of a business purpose is not controlled by the motive of the stockholder, *Estate of John B. Lewis*, 10 T. C. 1080, affd. 176 F. 2d 646, we are satisfied that the petitioner, as a stockholder and director, and that the other directors of Motor Sales, approved and carried out the reorganization in order to preserve Motor Sales' franchise. The preservation of the franchise clearly was germane to the conduct of the business of Motor Sales.

In the *Lewis* case consideration was given to the question of the existence of a business purpose in connection with a reorganization under section 112 (g) (1) (D). The old corporation, which operated three different lines of business, tried to sell its entire business. It was able to sell only two branches of its business for which it received cash and securities. It then conveyed the remaining assets and a por-

tion of the cash to a new corporation in exchange for the entire capital stock of the new corporation, and was promptly liquidated. The shareholders of the old corporation received the entire capital stock of the new corporation and the securities and the balance of the cash possessed by the old corporation. The business operations of the old company were carried on by the new corporation without interruption, and without change of location, policy, or personnel, for almost 3 years. We held that the exchange of the stock of the new corporation for part of the assets of the old corporation constituted a reorganization under section 112 (g) (1) (D). What was said in the *Lewis* case, at pages 1085 and 1086, is appropriate here:

Here, the petitioners organized a new company to conduct a business. They brought about a transfer of the operating assets from the old company to the new company. This they did with the intention that the new company carry on the business with those assets. For aught that any of the interested persons could foretell at that time, the new company would continue to conduct that business indefinitely, albeit the petitioners hoped that the business could eventually be sold for a fair price. The new company did in fact continue to conduct the business, without interruption, for a period of at least three years. Certainly, this transfer of assets from the old to the new company was for the very purpose of conducting a corporate business. That is what was done. It was no sham. Neither the transferor nor the transferee was ephemeral. Neither was a mere device or conduit for the conveyance of assets to a stockholder.

As in the *Lewis* case, the transfer of property by Motor Sales was made for the purpose of continuing the operations of Motor Sales, and the business, in fact, was continued in the modified corporate form. If anything, this is a stronger case than the *Lewis* case, for the ultimate purpose of the transfers in this case was to assure the continuance of the business operations of Motor Sales through the preservation of the Studebaker franchise. Neither Motor Sales nor Realty was a short-lived corporate shell designed to serve as a conduit for the conveyance of assets to the petitioner. Cf. *Helvering* v. *Gregory, supra.* We are satisfied that the use of the two corporations to carry on the business formerly carried on by Motor Sales alone, with petitioner's interest in the assets, as a sole shareholder, unchanged, was a genuine reorganization attended by continuity of interest and by an adequate business purpose.

It is held that the exchange of Motor Sales' real estate assets for Realty's entire capital stock was a reorganization within the meaning of section 112 (g) (1) (D). Realty and Motor Sales each was a "party to a reorganization" within the meaning of section 112 (g) (2), and the petitioner's exchange of 50 shares of stock of Motor Sales for the entire capital stock of Realty was a tax-free exchange under the provisions of section 112 (b) (3) of the 1939 Code.

*Decision will be entered under Rule 50.*