ESTATE OF ROBERT E. THURNER, DECEASED, P. SCOTT THURNER, PERSONAL REPRESENTATIVE, AND DORIS THURNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent THURNER HEAT TREATING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Thurner v. Commissioner
Docket Nos. 9589-75, 9591-75.
United States Tax Court
T.C. Memo 1978-229; 1978 Tax Ct. Memo LEXIS 284; 37 T.C.M. (CCH) 981; T.C.M. (RIA) 78229; June 21, 1978, Filed Roger C. Minahan and Richard C. Ninneman, for the petitioners. Rodney J. Bartlett, for the respondent. FEATHERSTON
MEMORANDUM FINDINGES OF FACT AND OPINION FEATHERSTON, Judge: These consolidated cases were assigned to and heard by Special Trial Judge Lehman C. Aarons pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed and served upon the parties on February 8, 1978. Subsequently, the petitioners filed exceptions thereto. Respondent filed no exceptions but did file a reply to petitioners' exceptions. After consideration of the entire record herein, the briefs of the *285 parties, petitioners' exceptions to the Special Trial Judge's report, and respondent's reply thereto, we conclude and decide that the report, which is hereinafter set forth as modified in minor respects, should be adopted as the opinion of the Court. REPORT OF THE SPECIAL TRIAL JUDGE AARONS, Special Trial Judge: Respondent determined a deficiency in the Federal income tax of Robert E. and Doris Thurner for their taxable year ended August 31, 1971, in the amount of $ 402,407.14, together with a negligence penalty, under section 6653(a), [1]/ in the amount of $ 20,120.36. After the trial of this case, Robert E. Thurner died, and his estate has been substituted as a party. Respondent also determined a deficiency in the Federal income tax of Thurner Heat Treating Corporation for its taxable year ended December 31, 1971, in the amount of $ 157,941.62, together with a negligence penalty, under 6653(a), in the amount of $ 7,897.08. These cases (docket Nos. 9589-75 and 9591-75, respectively) were consolidated for trial, briefing, and opinion. *286 A number of issues, including the negligence penalties, have been the subject of mutual concessions by the parties, and the only remaining issues are (1) whether Robert E. Thurner (hereinafter referred to as Thurner) on the one hand, or Thurner Heat Treating Corporation (hereinafter referred to as THT) on the other hand, was the seller of certain land located in Denver, Colorado; (2) whether, if the sale was by THT (as determined by respondent), all or part of the proceeds of such sale constituted a dividend to Thurner; and (3), if (2) is answered affirmatively, the amount of such dividend. FINDINGS OF FACT Many of the facts have been stipulated and are found accordingly. The stipulation of facts, supplemental stipulation of facts, and second supplemental stipulation of facts, and all attached exhibits are incorporated by this reference. Only those facts necessary for an understanding of this Opinion will be summarized below. Thurner and his wife, Doris, resided in Elm Grove, Wisconsin, at the time the petition in docket No. 9589-75 was filed. THT is a Wisconsin corporation having its principal office in Wauwatosa, Wisconsin.Both the Thurners and THT filed timely Federal *287 income tax returns for the taxable years at issue, with the Internal Revenue Service Center, Kansas City, Missouri. The Thurners filed a joint return. THT operates a custom order heat treating business. Through controlled heating it strengthens, hardens, softens, or tempers a variety of metal objects produced by its customers. After 1960 THT operated a single plant located in the Milwaukee area. At all times material to these proceedings, Thurner owned 100 percent of the voting stock of THT. Nonvoting stock (which in all other respects possessed the same attributes as the voting stock) was owned by Thurner's wife and their adult sons. Thurner was THT's principal executive officer. During the 1960's THT considered the possibility of expanding its operations in another geographical area, and in 1966 the board of directors authorized the purchase of certain property in Denver. THT's board of directors' minutes of March 9, 1966, recited that if this property could be acquired an industrial complex could be developed and a portion of the land could be reserved for a new facility for THT. At the September 1, 1967, corporate meeting, Thurner announced "that we were successful *288 in acquiring the 58 acres of land located in Denver, Colorado, for a price of $ 325,000." At that meeting it was expressly agreed that Thurner would act as agent and nominee of THT (THT not being licensed to do business in Colorado) in consummating the purchase and acquiring title in his name. Thurner entered into an agreement on September 7, 1967, for the purchase of such property (hereinafter referred to as the Denver property) for $ 322,500. As part of that agreement the seller, Irving Pasternak (Pasternak), agreed to provide at his expense a current Survey and Title Insurance Policy, to pay all normal closing costs and to pay all taxes, assessments, interest, and other charges against the property through the date of closing. Pasternak further agreed to repurchase the Denver property from Thurner at any time within 3 years after the sale, upon written notification of Thurner's exercise of the right to have Pasternak repurchase (hereinafter referred to as Thurner's "put") for the sum of $ 322,500 plus all sums expended by Thurner in relation to said property and plus 10 percent for profit and overhead to Thurner. Concurrent with the purchase of the real estate described above, *289 Pasternak, the seller of the property, was given an option to purchase for $ 1, on or before September 1, 1970, an undivided one-half interest in said real estate. That option was to have no force or effect until Thurner waived his "put" or if Pasternak refused to comply with a demand made by Thurner pursuant to his "put." Pasternak and Thurner had been joint venturers on various oil and gas deals and were old friends. In essence, the agreement on the Denver property was that THT would own a 50-percent interest and Pasternak would retain a 50-percent interest. The "put" and the option were designed to give THT a secured position. Thurner paid the purchase price of the Denver property with his personal funds. THT reimbursed him in full by December 1967. After certain adjustments which are not here at issue, the Denver property was carried on THT's records at a net cost of $ 320,453.61. Record title to the Denver property was never in THT's name but the parties agree that THT was the beneficial owner until January 9, 1970. The central dispute between the parties relates to the beneficial ownership after January 9, 1970. At the time of the acquisition by THT of its interest, *290 the Denver property was zoned partly for commercial (office building and shopping center) use. After September 1967, Pasternak and his associate investigated the possibility of rezoning all or a portion of the property for industrial use. No formal application for such rezoning was filed. THT contemplated the possibility of using about 5 of the 58 acres for a Denver plant, if such rezoning was possible. After concluding that industrial zoning was unlikely, Pasternak and his associate made some investigation (in 1969) into the possibility of rezoning for multiple-family residential use. His associate was advised by the local councilman that such rezoning would be up to the people in the area. He did not thereafter pursue the possibility of rezoning. Thurner suffered a series of heart attacks in 1969, 1970, and 1971, and submitted to open-heart surgery in September 1971. In 1968 and 1969, several attempts were made to sell the Denver property but no sale was consummated. In 1969 THT had decided not to expand its operations to the Denver area or any other area outside of Milwaukee. On several occasions in 1969 Thurner requested Pasternak to repurchase the Denver property, *291 pursuant to his "put" but Pasternak was short of funds, and Thurner did not exercise his rights under the "put." The minutes of THT's annual meeting of stockholders and directors, dated January 9, 1970, state in part: Mr. John Mangen proposed that in light of the present economic situation and the complete depression in the Denver area that our Company pursue the sale of the land in Denver that it now owns. Mr. Robert E. Thurner proposed that he buy the land from the Company at its cost price of $ 325,000.00. Mr. Thurner would pay the Company not less than $ 100,000.00 on December 31, 1971, $ 100,000.00 on December 31, 1972 and $ 125,000.00 on December 31, 1973. The minutes were signed by Thurner, his wife, John D. Mangen, Curtis Van Dyke, and Walter A. Adams. Van Dyke, though an officer, was neither a director nor a stockholder. He is Doris Thurner's brother. Also, it is very doubtful that Doris Thurner attended the meeting. Thurner, Mangen, Adams, and Van Dyke (in varying degrees of certainty and specificity) understood that a sale of the Denver property to Thurner had been effected or contracted for at that meeting. Early in 1970 Thurner told Pasternak that he (Thurner) *292 had acquired THT's interest in the Denver property. Title of record remained in Thurner's name as it had been since 1967, and there was no deed or other writing confirming the alleged transfer to Thurner of the Denver property. There were continued efforts to sell the property in 1970. On April 15, 1970, Pasternak notified Thurner of his intent to exercise his option to purchase for $ 1 a 50-percent interest in the property. Thurner delayed, however, in waiving his "put." Finally, on September 29, 1970, Pasternak and Thurner entered into a contract to sell the Denver property to L. C. Fulenwider Development Company, a well-known Denver developer, contingent upon rezoning of the property for multiple-family dwellings and other specified uses. (Prior to entering into this contract Thurner waived his "put" and Pasternak exercised his option to buy a one-half interest.) The closing date of the sale was to be 7 months from the date of the contract, or at a later date if rezoning was not obtained within the 7-month period. The stated purchase price was $ 1,505,000 less a commission of $ 130,000 payable to L. C. Fulenwider, Inc., a real estate sales agency. The balance of the principal *293 was payable within 5 years from the date of closing or, if rezoning was contested, within 7 years. In April 1971, Fulenwider was assured of the new zoning upon its agreement to pay $ 15,000 to improve a tennis court and upon Pasternak's agreement to convey certain adjacent lots (aggregating 40 acres) to the City for public purposes. The sale of the Denver property to L. C. Fulenwider Development Company was actually closed on May 12, 1971, with payments as follows: Gross sales price
$ 1,505,000.00
Interest prepaid by buyer
60,000.00
Total due sellers
$ 1,565,000.00
Less: Secured promissory note of buyer
to sellers
$ 1,375,000.00
Commission paid by buyer on be-
half of sellers
130,000.00
Prorated real estate tax charged
to sellers
6,608.30
Closing costs charged to seller
2,673.85
$ 1,514,282.15
Net cash to sellers
$ 50,717.85
Thurner's one-half of cash
$ 25,358.43
On the joint income tax return filed by the Thurners for their taxable year ended August 31, 1971, the sale of the Denver property was reported under the installment method. Long-term capital gain on sale of the property in the net amount of $ 15,128.18 and interest of $ 30,000, *294 representing one-half of the amount of $ 60,000 prepaid by the buyer as set forth above, was included in taxable income on such return. In December 1971, Thurner paid THT the total amount of $ 320,453.61, the net cost of the Denver property as shown on THT's books. Subsequent to May 12, 1971, a Beverly Hills developer joined L. C. Fulenwider Development Company in development of the Denver property. Payments were made on the promissory note due Thurner and Pasternak in December 1971, in the amount of $ 758,485 and the final payments totalling $ 697,610.90 were made in May and June 1972.On the joint income tax return filed by the Thurners for their taxable year ended August 31, 1972, additional long-term capital gain on the installment sale of the Denver property, in the net amount of $ 174,785.50, and additional interest on the Fulenwider note of $ 6,073.95 were included in taxable income. Entries reflecting the minutes of the January 9, 1970, meeting of THT's stockholders and directors, the subsequent transfer of a one-half interest in the Denver property to Pasternak, the contract to sell the Denver property to L. C. Fulenwider Development Company of September 29, 1970, and *295 the actual sale closed on May 12, 1971, were not made on the financial records of THT. Upon receipt of payment equal to THT's book value from Thurner in December 1971, entries were made on THT's books to record transfer of the property to Thurner at THT's cost. On the financial statements of THT for the year ended December 31, 1970, prepared by the firm of Reilly, Penner, and Benton, Certified Public Accountants, the Denver property is shown as an asset at its book value of $ 320,453.61, an account receivable due from Thurner is shown in the amount of $ 625, and accrued real estate tax on the Denver property is shown as a liability in the amount of $ 14,757.18. On August 18, 1970, Thurner wrote a letter to Pasternak's associate, stating in effect that Pasternak's attempt of April 15, 1970, to exercise his option, while the "put" was still outstanding, was untimely. That letter was on THT letterhead, and was signed by Thurner in the name of THT. Real estate tax on the Denver property, accrued on THT's records as of December 31, 1970, in the amount of $ 14,757.18, was paid by THT in January 1971. Such amount was deducted on the income tax return of THT for the year ended December 31, 1970. *296 THT paid and deducted for income tax purposes real estate tax on the Denver property as follows: Year
Amount
1967
$ 4,059.90
1968
6,924.97
1969
6,926.55
Subtotal
$ 17,911.42
1970
14,757.18
Total
$ 32,668.60
One-half of the amount of $ 32,668.60 ($ 16,334.30) was properly chargeable to Pasternak upon exercise of his option to repurchase a one-half interest in the property. The parties agree that if it is determined that Thurner was the owner of one-half of the Denver property for Federal income tax purposes, one-half of the amount of $ 14,757.18 ($ 7,378.59) was properly chargeable to him. On September 9, 1971, Pasternak's check payable to Thurner, in the amount of $ 15,818.39, in partial payment of the Denver taxes was deposited in Thurner's personal checking account. The parties agree that if it is determined that Thurner was the owner of one-half of the Denver property for Federal income tax purposes, THT overpaid its share and overdeducted for income tax purposes Denver real estate taxes to the extent of $ 23,712.89. ULTIMATE FINDINGS OF FACT 1. THT's corporate minutes of January 9, 1970, reflected a continuing offer by Thurner to purchase *297 THT's interest in the Denver property at its book value. 2. Thurner's said offer was accepted by THT simultaneously with the closing of the sale to L. C. Fulenwider Development Company on May 12, 1971, and THT continued as beneficial owner of its interest in the Denver property until that date. OPINION The basic question to be answered by the Court is a factual question, i.e., who was the seller of the Denver property? The issue of who is the owner of the property for Federal income tax purposes is a question of fact to be determined from an examination of all the facts and circumstances. Schoenberg v. Commissioner,302 F.2d 416, 419 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; Snyder v. Commissioner,66 T.C. 785, 791 (1976). If, as of the moment of closing on May 12, 1971, THT was the seller, then respondent is correct in attributing to THT the gain on the sale, and in treating the unrestricted retention by Thurner of the sales proceeds (in the form of cash and an interest in the buyer's installment note) as, at least in part, a dividend *298 distribution by THT to Thurner. As in all other factual issues presented to this Court (except in the case of increases in deficiencies and affirmative matters pleaded in the answer), respondent's determination is presumptively correct. The burden of proof is upon the petitioners. Rule 142(a) of this Court's Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111, 115 (1933). In answering this factual question, the general rule on burden of proof does not stand alone in denoting the approach which must be taken by the Court. As reiterated by the Court of Appeals for the Seventh Circuit in Ingle Coal Corp. v. Commissioner,174 F.2d 569, 571 (7th Cir. 1949), affg. 10 T.C. 1199 (1948): Transactions between a corporation and its controlling stockholders are subject to special scrutiny. Without question, Thurner was in full control of THT and beyond this, in approaching the solution to this factual question, the Court must bear in mind *299 the fiduciary relationship assumed by a shareholder in dealing with his controlled corporation. This concept was set forth in Utter-McKinley Mortuaries v. Commissioner,225 F.2d 870, 873 (9th Cir. 1955), affg. a Memorandum Opinion of this Court, as follows: McKinley as to the corporation was a fiduciary, bound to act with the utmost good faith. He could not obtain a personal advantage in a transaction which was initiated for the benefit of the entity for which he was acting. * * * That court went on to say that this thesis would be applicable even if the shareholder did not have control; with control, an added burden rests upon the taxpayer. See also, on this point, Farr v. Commissioner,24 T.C. 350, 363 (1955). Lastly, so far as concerns the Court's general approach to the question "who was the seller," the principle enunciated in Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945), must be adhered to. The Supreme Court there stated: "A sale by one person cannot be transformed for tax purposes into a sale by another by *300 using the latter as a conduit through which to pass title." Under Court Holding, if the executed sale was in substance a sale by the corporation, the Court will not be bound by the formalities employed by the parties in passing title. Likewise here, if it should be concluded that THT remained as beneficial owner up to approximately May 12, 1971, the exact moment of transfer of beneficial ownership of the property or sales proceeds to Thurner is unimportant; in such event Court Holding would mandate treating THT as the seller and taxing it on the gain generated by the sale. And to the extent that it is determined that the proceeds of such sale were then transferred to Thurner, dividend consequences would ensue regardless of the presence or absence of any formal act of transfer by THT to Thurner.Cf. Jaeger Motor Car Co. v. Commissioner,284 F.2d 127, 131 (7th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 365 U.S. 860 (1961). Under the standards laid down in our Rules and in the cited cases, petitioners here have failed to carry their burden of proof. There are just too many things to be rationalized and explained away *301 to enable the Court to conclude that beneficial ownership of the Denver property or its proceeds had been transferred to Thurner before May 12, 1971. A substantial portion of the dispute between the parties and the argument in the briefs has been focused upon the applicability or nonapplicability of the parol evidence rule in connection with the purport and meaning of the corporate minutes of January 9, 1970. See Estate of Craft v. Commissioner,68 T.C. 249, 259-264 (1977), on appeal (5th Cir., Nov. 18, 1977) and cf. Estate of Bette v. Commissioner,T.C. Memo. 1977-404. On their face, those minutes reflect nothing more than a proposal or an offer, on the part of Thurner, to purchase the Denver property. The testimony of the individuals who attended that meeting (objected to by respondent under the parol evidence rule) was unconvincing to the Court and, hence, even though it be assumed arguendo that respondent's parol evidence position was correct, respondent was not prejudiced by the admission of such testimony. The testimony of these witnesses amounted to little more than affirmation by each of them of the legal conclusion that a *302 sale to Thurner had been committed or consummated and that beneficial ownership had been transferred at that meeting to Thurner together with a set of alleged reasons why such a transfer had been contemplated. However, the Court is of the opinion that such transfer of beneficial ownership took place only tentatively, and at best it took place only as a state of mind on the part of Thurner and his controlled subordinates. Particularly in a case such as this, where no deed or formal transfer was required to transfer beneficial ownership, and where a shareholder was dealing (in a fiduciary capacity) with his controlled corporation, other definitive and objective proof of such a transfer seems imperative. Even though it may be that an intent to transfer existed in the mind of Thurner and his subordinates, the Court must be governed by proof of what was actually done, rather than by divination of the state of mind of the individuals involved. As said by Learned Hand, "taxes, like other human affairs, must be determined without the gift of divination." DeLoss v. Commissioner,28 F.2d 803, 804 (2d Cir. 1928), *303 affg. 6 B.T.A. 784 (1927), cert. denied 279 U.S. 840 (1929). Assuming that the Court may properly go beyond the wording of the January 9, 1970, minutes, which reflected only a proposal or an offer by Thurner, the objective facts are ambivalent and do not carry the day for petitioners. The January 9, 1970, meeting itself was characterized by irregularities. It seems highly doubtful that Doris Thurner was in attendance though the minutes so recited.Curtis Van Dyke, who attended the meeting and signed the minutes was neither a shareholder nor a director. Although questions were raised at the trial as to the quorum requirements for a shareholders and directors meeting, such questions were not answered. Subsequent to the meeting, on August 18, 1971, Thurner wrote a business letter relative to the Denver property on THT stationery and signed in THT's name. No change was made on the corporate records or financial statements until December 1971, i.e., after Thurner paid THT the amount of the book value of the property. And in the meantime, THT paid or accrued the Denver property real estate taxes. Petitioners sought to explain most of the facts at the *304 trial.The inept language of the minutes and the irregularities at the meeting were attributed to Thurner's lack of legal training. As to the August 18, 1971, letter appearing on its face to be a THT letter, it was explained that Thurner had no personal stationery. The corporate records and financial statements were explained (to the Court, unconvincingly) as resulting from gross oversight or negligence on the part of the certified public accountants. The same type of explanation was made relative to the payment or accrual of the Denver property tax bills, [2] coupled with Thurner's lack of close attention to details because of his serious health problems. Although no single one of these facts might be weighty enough to negate petitioners' position, their cumulative effect is such as to leave the Court unpersuaded that petitioners have carried their burden of proof. *305 The Court is similarly unpersuaded by the reasons advanced by Thurner and other witnesses for petitioners for the alleged transfer of beneficial ownership to Thurner. The alleged desire to keep THT out of a real estate speculation must be weighed against the fact that from the very inception it was never intended that THT would occupy more than 5 of the 58 acres; the intention was that the remainder would be developed. The bad state of Thurner's health--given as a reason for selling the land--seems more a reason for sale by THT to outsiders than to Thurner himself. So far as concerns Thurner's assertion that the transfer of beneficial ownership would make it easier for him to put pressure on Pasternak, such assertion strikes the Court as nothing more than a rationalization. There is nothing persuasive in the record that to Pasternak or any other outsider the identity of the beneficial owner (as between Thurner and THT) made any difference whatsoever. In the overall, the record contains no persuasive reason why any of the acts following the January 9, 1970, meeting culminating in the sale to Fulenwider, could not or would not have been performed and consummated exactly as they *306 were performed and consummated had beneficial ownership indisputably remained in THT. In other words, the objective facts and developments subsequent to the alleged but unproven change of beneficial ownership are no less consistent with continued corporate ownership than they are with Thurner's individual ownership of the beneficial interest in the Denver property. [3]
Petitioners argue that if the Court "adopts the theory of a continuing corporate ownership just prior to the May 12, 1971, sale of the subject property then there is no basis for termination of Thurner's agency status at the closing of the sale or upon receipt of a note from the buyers." This argument is not tenable. In the Court's view, petitioners have failed to sustain their burden of demonstrating error in respondent's determination that the May 12, 1971, closing of the sale effectuated *307 a dividend distribution from THT to Thurner. At no time after May 12, 1971, did THT assert any dominion over the cash and the interest in the note received at the closing. In the Court's view, the May 12, 1971, sale was the first definitive event establishing Thurner's beneficial ownership. At least, in the Court's view, petitioners have not proven otherwise. Petitioners also raise the question in their original brief (but do not elaborate or argue the point) that if it is determined that Thurner received a part interest in the buyer's note as a dividend, is the amount of such dividend reduced by the payment made by Thurner to THT in December 1971, of THT's net cost for the Denver property? Although respondent argues that Thurner's December 1971, payment to THT was a contribution to its capital, in the opinion of the Court, this question raised by petitioners should be answered affirmatively. The January 9, 1970, THT minutes were worded in terms of an offer on the part of Thurner and in the Court's view reflected a continuing offer which was finally and unequivocally accepted by THT simultaneously with the closing sale of the Denver property on May 12, 1971. [4]Thurner *308 thus became a "bargain sale" purchaser on May 12, 1971, of THT's interest in the Denver property. [5] Petitioners offered no proof that the buyer's note was worth less than its face value.
As stated by this Court in Riss v. Commissioner,56 T.C. 388, 429 (1971), affd. 478 F.2d 1160 (8th Cir. 1973): * * * where the corporate property is sold to a stockholder at less than its fair market *309 value, the transaction may be regarded as a bargain purchase with the "bargain" element being taxed to the shareholder as a dividend. Southern Ford Tractor Corporation,29 T.C. 833 (1958); and Stanley V. Waldheim,25 T.C. 839 (1956), affd. 244 F.2d 1 (C.A. 7, 1957). Here, simultaneously with the May 12, 1971, closing, Thurner acquired either a fleeting interest in the Denver property or in the buyer's note and other sales proceeds, at a bargain price, the bargain element (and, accordingly, the amount of the dividend to Thurner) being the difference between THT's book value and a 50-percent interest in the face amount of the buyer's note. Counsel for the parties agreed at the trial that there is no issue between them as to dollar amounts, subject to possible proof as to the fair market value of the buyer's note. As already indicated, petitioners offered no proof to rebut respondent's determination in that respect. Accordingly, the foregoing Opinion, including the holding that the amount of the dividend to Thurner is to be reduced by the payment made by him to THT in December 1971, together with the concessions made by the parties, *310 will furnish a basis for computation of the deficiencies. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. It is noted that THT's return for 1970 included a deduction for the 1970 real property taxes accrued with respect to the Denver property and that no amended return was filed although the C.P.A.'s testimony was that the "error" in treating THT as the owner of the Denver property was "discovered" shortly after that return was filed.↩
3. Respondent also produced expert testimony and an appraisal report as to the value of the Denver property in Jan. 1970.Inasmuch as respondent is not contending that a bargain sale to Thurner took place in Jan. 1970, and is strenuously contending that no sale took place, the Court deems this evidence to be irrelevant.↩
4. It is elementary, of course, that an offer may be accepted by an act as well as by words (see Restatement of the Law of Contracts, sec. 21↩) and that an offer, until terminated, gives the offeree a continuing power to create a contract by accepting the offer (Id. sec. 34). 5. As set forth above, under the principle of Commissioner v. Court Holding Co.,324 U.S. 331, 334↩ (1945), the precise moment of such transfer of beneficial ownership is of no consequence. Under the Court's view of this case, the sale must be attributed taxwise to THT.